

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00348-CV

IN RE STEVEN AND SHYLA                                      RELATORS
LIPSKY AND ALISA RICH

----------

### ORIGINAL PROCEEDING

----------

## OPINION

----------

Relators Steven and Shyla Lipsky (the Lipskys) and Alisa Rich seek a writ of mandamus that directs the trial court to dismiss the claims asserted against them by real parties in interest Range Production Company and Range Resources Corporation (Range). Relators contend that provisions contained within chapter 27 of the civil practice and remedies code (chapter 27) require the

dismissal of Range's claims.[1]  We conditionally grant relief in part and deny relief in part.[2]

## Background Facts

The Lipskys own a home in the Silverado on the Brazos development in Weatherford.  In 2005, they drilled a well to a depth of about two hundred feet to provide water to their home and property, and they also constructed a large holding tank to meet the anticipated water needs at the property.  Range drilled two natural gas wells in 2009 near the Lipskys' property.  According to the Lipskys, in the latter part of 2009, they began noticing problems with their water,

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011 (West Supp. 2012).  Chapter 27, also known as the Texas Citizens' Participation Act, is "considered to be anti-SLAPP legislation.  SLAPP stands for Strategic Lawsuit Against Public Participation, and approximately twenty-seven states have enacted anti-SLAPP legislation." *Jennings v. WallBuilder Presentations, Inc.*, 378 S.W.3d 519, 521 & n.1 (Tex. App.—Fort Worth 2012, pet. filed).

[2]In February 2012, the Honorable Trey Loftin, who at that time was the presiding judge of the 43rd District Court of Parker County, signed the order denying relators' motions to dismiss.  In June 2012, the presiding judge of the 8th Administrative Judicial Region of Texas, the Honorable Jeff Walker, assigned the Honorable Graham Quisenberry, who is the presiding judge of the 415th District Court of Parker County, to preside in the underlying cause between the parties to this original proceeding.  Accordingly, we substitute Judge Quisenberry as the respondent of this original proceeding for Judge Loftin.  All of the relators, the real parties in interest, and Judge Quisenberry filed documents with this court waiving any entitlement to abatement of this original proceeding for the purpose of Judge Quisenberry's possible reconsideration of Judge Loftin's ruling on relators' motions to dismiss.  *See* Tex. R. App. P. 7.2(b); *In re Gonzales*, 391 S.W.3d 251, 251–52 (Tex. App.—Austin 2012, orig. proceeding) (abating an original proceeding when the judge who made the ruling in dispute removed herself from the proceedings and a new judge was assigned to the underlying case).

and by the middle of 2010, their water pump began experiencing "gas locking," meaning that the pump could not efficiently move water. The Lipskys contacted public health officials, who referred them to Rich. After the Lipskys contracted in August 2010 with Rich and her company, Wolf Eagle Environmental, to conduct testing, she confirmed the presence of various gases in the Lipskys' water well.

In December 2010, after being notified by Rich and the Lipskys about the circumstances at the Lipskys' property and after conducting its own investigation, the Environmental Protection Agency (EPA) issued an emergency order stating that Range's production activities had caused or contributed to the gas in the Lipskys' water well and that the gas could be hazardous to the Lipskys' health. In the order, the EPA required Range to, among other actions, provide potable water to the Lipskys and install explosivity meters at the Lipskys' property. The federal government, acting at the request of the EPA, later filed a lawsuit in a federal district court against Range, alleging that Range had not complied with requirements of the emergency order.

The Railroad Commission of Texas (the Railroad Commission) also investigated the contamination of the Lipskys' well. After calling a hearing and listening to testimony from several witnesses in January 2011, the Railroad Commission issued a unanimous decision in March 2011 that Range had not

3

contaminated the Lipskys' water.[3]   Thus, the Railroad Commission allowed production from Range's wells to continue.

In June 2011, the Lipskys sued several defendants, including Range, for claims related to the contamination of their water well that, according to the Lipskys, resulted from Range's "oil and gas drilling activities."   In their original petition, the Lipskys claimed that the contamination had caused a water pump to malfunction and had caused the water "to be flammable."   Against Range, the Lipskys sought compensatory and punitive damages while asserting causes of action for negligence, gross negligence, and private nuisance.   The Lipskys alleged that Range's drilling, including hydraulic fracture stimulation operations (fracking), affected their water source, and they contended that they could no longer use their home as a residence.[4]

---

[3]Range had presented evidence to the commission, through geochemical gas fingerprinting, that the gas in the Lipskys' well did not match gas from the depth of the Barnett Shale, where Range was drilling.  Range had also presented evidence that its drilling casing near the Lipskys' home was not leaking.  In its decision, the commission explained that domestic wells in the area of the Lipskys' well had contained methane gas for many years.   The commission further stated, "Given that the separation between the Barnett Shale and the aquifer [providing water to the Lipskys' well] is about 5,000 feet, it is evident that hydraulic fracturing of the Barnett Shale has not caused any communication with the aquifer."

[4]Pursuant to Range's plea to the jurisdiction, the trial court eventually dismissed the Lipskys' claims against Range on the basis that the Lipskys were required to appeal the Railroad Commission's decision in Range's favor by filing a suit in a Travis County district court.  The propriety of the dismissal of the Lipskys' affirmative claims against Range is not at issue in this original proceeding.

A month after the Lipskys sued Range, Range answered the suit and brought counterclaims (against the Lipskys) and third-party claims (against Rich) for civil conspiracy, aiding and abetting, defamation, and business disparagement. Range contended, among other arguments, that Range's fracking of a deep shale formation could not have contaminated the Lipskys' much shallower water well; that Range's two gas wells near the Lipskys' residence had "mechanical integrity"; that other factors occurring before Range's drilling contributed to gas in the Lipskys' well; that the Railroad Commission had already found that Range's drilling did not contaminate the Lipskys' well; that the contrary conclusion that had been reached by the EPA was based on incomplete and overlooked data;[5] that the Lipskys had ignored the Railroad Commission's findings by continuing to blame Range for the contamination; that Rich, along with the Lipskys, had, with malice against Range, made false, misleading, and disparaging statements; and that Range's business reputation had therefore suffered.

The Lipskys and Rich each answered Range's claims against them, and they later each filed motions to dismiss the claims under chapter 27. In their motions, relators argued, among other contentions, that through bringing its

---

[5]An EPA official testified in a deposition that he was not certain that Range caused the contamination of the Lipskys' well and that the EPA did not evaluate the geology below the Lipskys' well, including a shallower gas formation in the vicinity of the Lipskys' property that might have contributed to the contamination. In March 2012, the EPA withdrew its administrative order against Range.

affirmative claims, Range intended to suppress relators' right of free speech and their right to petition (including petitioning the EPA to act on the Lipskys' water contamination) and that Range had not provided clear and specific evidence establishing prima facie proof of each element of its claims. Documents attached to the Lipskys' motion to dismiss established, among other facts, that the possible contamination of water by drilling and fracking has been a matter of public concern in recent years; that the Lipskys began noticing problems with their drinking water in 2009, which was after Range began drilling; that in 2005, before Range began production in Silverado on the Brazos, Steven Lipsky saw another water well that contained gas fumes; that the Lipskys cooperated with Rich (and her company, Wolf Eagle Environmental) to obtain water and air samples (which showed the presence of benzene, toluene, ethane, and methane) and to get the EPA involved in investigating the contamination of the Lipskys' well; that the Lipskys complained to the Railroad Commission about their water well containing natural gas; that Steven Lipsky created a video of igniting gas from his well and shared the video with "friends and family";[6] that as of his deposition in January 2011, Steven Lipsky still was not sure how natural gas entered his well water; that Rich testified in a deposition that the test results from the Lipskys' water were "not . . . high enough to cause an imminent . . .

_____

[6]Two local news stations broadcast a video taken from the Lipskys' residence. The broadcasts mentioned Range and stated that a homeowner had lit water on fire.

6

danger"; and that Rich told the EPA that Steven Lipsky had "demonstrated in her presence that he could light his water hose which was attached to his well vent and that a '10-foot flare' was the result."

Range opposed the motions to dismiss, detailing the evidence that Range offered in support of the claims. The trial court denied the motions. Relators filed an interlocutory appeal, and we dismissed the appeal for want of jurisdiction.[7] However, we allowed relators to challenge the propriety of the trial court's order denying the dismissal motions through this original proceeding.[8]

## Mandamus Standards

Mandamus relief is proper only to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 207 (Tex. 2009) (orig. proceeding); *In re Aslam*, 348 S.W.3d 299, 301 (Tex. App.—Fort Worth 2011, orig. proceeding). A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. *In re Olshan Found. Repair Co.*, 328 S.W.3d 883, 888 (Tex. 2010) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).

---

[7]*Lipsky v. Range Prod. Co.*, No. 02-12-00098-CV, 2012 WL 3600014, at *1 (Tex. App.—Fort Worth Aug. 23, 2012, pets. filed) (mem. op.) (citing *Jennings*, 378 S.W.3d at 529).

[8]*Id.*

7

With respect to the resolution of factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court unless a relator establishes that the trial court could reasonably have reached only one decision and that the trial court's decision is arbitrary and unreasonable. *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding); *Walker*, 827 S.W.2d at 839–40; *In re Tex. Collegiate Baseball League, Ltd.*, 367 S.W.3d 462, 468–69 (Tex. App.—Fort Worth 2012, orig. proceeding). This burden is a heavy one. *Aslam*, 348 S.W.3d at 302 (citing *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (orig. proceeding)).

While we give deference to a trial court's factual determinations that are supported by evidence, we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). A trial court abuses its discretion if it fails to analyze the law correctly or misapplies the law to established facts. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975). Also, a trial court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion. *In re United Scaffolding, Inc.*, 301 S.W.3d 661, 663 (Tex. 2010) (orig. proceeding).

**Standards for Motions to Dismiss Under Chapter 27**

When the legislature enacted chapter 27 in 2011, it expressed that the purposes of doing so were to "encourage and safeguard the constitutional rights

8

of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002. To promote these purposes, chapter 27 creates an avenue at the early stage of litigation for dismissing unmeritorious suits that are based on the defendant's exercise of the rights of free speech, petition, or association as those rights are defined within the chapter. *Id.* § 27.003; *see also id.* § 27.001(2)–(4) (defining the exercise of the right of association, the exercise of the right of free speech, and the exercise of the right to petition).

To prevail on a motion to dismiss under chapter 27, a defendant has the burden to show by a preponderance of the evidence that the plaintiff's legal action is "based on, relates to, or is in response to" one of the rights discussed above. *Id.* § 27.005(b). If the defendant meets its burden, the plaintiff, to avoid dismissal, must then establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Chapter 27 does not define what sort of evidence satisfies the "clear and specific" qualitative standard, but it expresses that in determining the propriety of dismissal, courts may consider "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a); *see also Jennings*, 378 S.W.3d at 526 ("[T]he overall structure of [chapter 27] requires

9

judicial review . . . of limited evidence . . . concerning the elements . . . of a legal action involving a party's exercise of the right of free speech, right to petition, or right of association . . . ."). In cases unrelated to motions to dismiss under chapter 27, Texas courts have defined "prima facie" evidence as the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (citing *Tex. Tech Univ. Health Scis. Ctr. v. Apodaca*, 876 S.W.2d 402, 407 (Tex. App.—El Paso 1994, writ denied)); *see also Elliott v. Elliott*, 21 S.W.3d 913, 917 (Tex. App.—Fort Worth 2000, pet. denied) (stating that whether a prima facie case has been presented is a question of law for the court).

## Relators' Procedural Compliance with Chapter 27

In its briefing, Range argues, in part, that relators cannot show that the trial court clearly abused its discretion by denying relators' motions to dismiss because relators "refused to comply with the mandatory deadline for a timely hearing" under section 27.004 of the civil practice and remedies code. Section 27.004 provides that a hearing on a motion to dismiss under chapter 27 "must be set not later than the 30th day after the date of service of the motion unless the docket conditions of the court require a later hearing." Tex. Civ. Prac. & Rem. Code Ann. § 27.004. Range contends that relators "forfeited their rights to seek

dismissal of Range's claims . . . by refusing to comply with the mandatory time requirement of Section 27.004."

The Lipskys filed their motion to dismiss Range's claims on September 12, 2011, and Rich filed her motion to dismiss the claims two days later. Range concedes that "[d]ue, at least in part, to intervening docket conditions" of the trial court, the hearing on relators' motions to dismiss was first set for December 19, 2011.[9] Range filed its response to relators' motions to dismiss on the afternoon of December 16, 2011, which was a Friday. The response included an appendix containing more than 1,600 pages of documents. On December 19, relators sought a continuance of the dismissal hearing on the ground that they needed more time to digest Range's response, and over Range's objection, the trial court granted a continuance and reset the hearing on relators' motions for January 31, 2012. The trial court conducted the hearing on January 31 and denied relators' motions on February 16, 2012.

Range does not contend that the trial court's initial hearing date of December 19, 2011 was improper, but Range argues that the continuance of the hearing until January 31, 2012 violated section 27.004. In the trial court, the Lipskys contended that they complied with section 27.004 because that section requires a hearing on a motion to dismiss to be "set," not heard, within thirty days

---

[9]The record indicates that the trial court chose to hear Range's plea to the jurisdiction concerning the Lipskys' claims against Range before hearing relators' motions to dismiss Range's claims.

(or later if required by the docket conditions of the court) of the service of the motion.

As we explained in *Jennings*,

In construing statutes, our primary objective is to give effect to the legislature's intent. We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results. Even when it appears that the legislature may have made a mistake, courts are not empowered to "fix" the mistake by disregarding direct and clear statutory language that does not create an absurdity.

378 S.W.3d at 523 (citations omitted); *see Tex. Real Estate Comm'n v. Bayless*, 366 S.W.3d 808, 811 (Tex. App.—Fort Worth 2012, pet. denied) (explaining that ordinary citizens should be able to rely on the plain language of a statute to mean what it says and that straying from the plain language of a statute risks encroaching on the legislature's function to decide what the law should be).

We agree with relators that the plain language of section 27.004 applies to the setting, not the hearing or consideration, of a chapter 27 motion to dismiss; if the legislature had meant to require the holding of a hearing within thirty days (or as soon as the trial court's docket allows) rather than the setting of a hearing within that time period, it knew how to say so. *See, e.g.*, Tex. Fam. Code Ann. § 8.258(b) (West 2006) (stating that when a spousal maintenance obligor files a motion to stay the issuance of a writ of withholding, the trial court "shall *hold a hearing* on the motion to stay not later than the 30th day after the date the motion was filed unless the obligor and obligee agree and waive the right to have the

12

motion heard within 30 days") (emphasis added); *id.* § 158.309(b) (West 2008) (stating similarly with respect to a motion to stay in a child support case); Tex. Fin. Code Ann. § 92.254(a) (West 2013) ("A hearing [for the conversion of a savings bank to another financial institution] *must be held not later than the 25th day* after the date the application is filed . . . .") (emphasis added). We decline Range's invitation for us to interpret section 27.004 in a way that adds language to its setting requirement. *See Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 846 (Tex. 2009) (stating that a court usurps its powers when it adds language to a law where the legislature has refrained). Moreover, we conclude that applying the statute's plain meaning does not lead to an absurd result because that meaning encourages trial courts to resolve a chapter 27 motion to dismiss quickly while allowing flexibility for extending the time for hearing the motion under circumstances similar to those that relators faced in this case.[10] We therefore reject Range's argument that relators waived their motions to dismiss by seeking a continuance of the setting of the hearing from December 19, 2011 until January 31, 2012.

**The Bases of Range's Claims**

To trigger the mechanism for the dismissal of Range's claims against them under chapter 27, relators had the initial burden to establish by a preponderance

---

[10]We note that we have been instructed to construe chapter 27 liberally to "effectuate its purpose and intent fully." Tex. Civ. Prac. & Rem. Code Ann. § 27.011(b).

13

of the evidence that Range's claims are based on, relate to, or are in response to relators' exercise of the right of free speech, right to petition, or right of association. Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(a), .005(b). In denying relators' motions to dismiss, the trial court did not expressly determine whether relators had met this burden.

In chapter 27, the exercise of the right to petition includes "a communication in or pertaining to," among other venues, a judicial proceeding, an "official proceeding . . . to administer the law," a "proceeding before a department of the state or federal government or a subdivision of the state or federal government," or a "public meeting dealing with a public purpose." *Id.* § 27.001(4)(A)(i)–(iii), (ix). Also, the exercise of the right to petition includes "a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding." *Id.* § 27.001(4)(C).

In Range's original pleading that asserted counterclaims against the Lipskys and a third-party claim against Rich, Range expressed that its affirmative claims were based on relators' strategy to involve the EPA in the gas issue at the Lipskys' home;[11] on Rich's communications with EPA personnel, which according to Range, the EPA "used . . . in issuing the draconian ex parte order

---

[11]Particularly, Range asserted that the "Lipskys conspired with Rich in a strategy to get the EPA involved by using false and misleading information to manufacture a non-existent imminent danger and to falsely blame Range's operations for the alleged contamination."

14

against Range";[12] on the Lipskys' statements about their drinking water; and on the Lipskys' communications with news media. When Range filed its response to relators' motions to dismiss, Range alleged that its claims could be supported by, among other allegations, multiple contacts with the EPA made by Rich, Steven Lipsky, and one of the Lipskys' attorneys; by the Lipskys' alleged statements that blamed Range for contaminating the well; by statements made by the Lipskys' agents and by Steven Lipsky in official hearings about the appraisal of the value of the Lipskys' home; by statements reported in newspaper articles; and by Steven Lipsky's communication with Parker County officials.

We conclude, based on these facts alleged by Range in its pleading and in its response to relators' motions to dismiss, that Range's claims are based on or relate to relators' exercise of their "right to petition" as chapter 27 defines that term.[13] Taking all of Range's allegations as true, many of the statements at issue were made to encourage the "review of an issue" (the contamination of the Lipskys' well) by a "governmental body" (the EPA). *See id.*[14] Moreover, other

---

[12]Range alleged that Rich "concocted a disingenuous plan to improperly acquire samples and develop false conclusions from allegedly objective data regarding the presence of natural gas in the [Lipskys'] water well."

[13]Thus, we need not determine whether relators' affidavits, which Range asserts are conclusory, provide additional evidence that satisfied relators' burden under section 27.005(b). Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b); *see* Tex. R. App. P. 47.1.

[14]Rich also presented evidence that she contacted the Parker County Fire Department to express concerns about the contamination of the Lipskys' well.

15

statements upon which Range expressly bases its defamation and business disparagement claims were indisputably made in official proceedings or public meetings, such as appraisal proceedings, and those statements therefore also qualify as the exercise of the right to petition. *See id.* § 27.001(4)(A)(ii), (ix).

Moreover, under chapter 27, the exercise of the right of free speech occurs when a communication is "made in connection with a matter of public concern." *Id.* § 27.001(3). The environmental effects of fracking in general, the specific cause of the contamination of the Lipskys' well, and the safety of Range's operation methods are matters of public concern under chapter 27. *See id.* § 27.001(7)(A)–(B), (E) (defining "[m]atter of public concern" as an issue related to, among other topics, health, safety, environmental well-being, or a "service in the marketplace"); *see also Avila v. Larrea*, No. 05-11-01637-CV, 2012 WL 6633994, at *6 (Tex. App.—Dallas Dec. 18, 2012, no pet. h.) (holding that a communication about the legal services offered by an attorney was a matter of public concern under chapter 27 because it concerned a service in the marketplace).[15] The EPA determined in its emergency administrative order that the chemicals found in the Lipskys' well "pose a variety of risks to health of

---

[15]We note that the public's interest in fracking and the contamination of the Lipskys' well is evidenced by, among other facts in the record, the Railroad Commission's public hearing into the contamination of the well, the reporting of the EPA's action against Range by The Wall Street Journal, local newscasts concerning the gas in the Lipskys' well, a story in the Fort Worth Star-Telegram about the Railroad Commission's proceedings, and a story in The New York Times concerning the EPA's emergency order against Range.

persons." Many of relators' statements upon which Range bases its claims were made in "connection with" fracking, the contamination of the Lipskys' well, and aspects of Range's business. Furthermore, in its defamation and business disparagement claims, Range relies on statements made by Steven Lipsky and his counsel concerning Range's alleged political power and the Railroad Commission's alleged corrupt system. Under chapter 27, these communications, relating to the operation of the government, were also made on matters of public concern. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7)(C).

Range argues that the statements underlying its claims against relators do not relate to the "right of free speech" or the "right to petition" because the statements were defamatory and were therefore not constitutionally protected. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116–17 (Tex. 2000) (explaining that federal and state constitutional protections do not outweigh a plaintiff's constitutional right of redress for reputational torts). But chapter 27 dictates that we should review evidence concerning whether relators' statements were defamatory and thus actionable in the second part of our review, in which Range has the burden of establishing "by clear and specific evidence a prima facie case for each essential element of the claim in question." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). The statutory definitions for the exercise of the right of free speech and the exercise of the right to petition do not include language requiring us to determine the truth or falsity of communications when

17

deciding whether a movant for dismissal has met its preliminary preponderance of the evidence burden under section 27.005(b). *See id.* §§ 27.001(3)–(4), 27.005(b); *see also Harris Cnty. Hosp. Dist.*, 283 S.W.3d at 846 (expressing that courts should not add language to a statute while implementing it).

For these reasons, we conclude that relators met their initial burden of showing by a preponderance of the evidence that Range's claims are based on or relate to relators' exercise of their rights of free speech or of their rights to petition as defined by chapter 27. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)(1)–(2).

### The Evidence of Range's Claims

We have concluded that relators met their burden of showing by a preponderance of the evidence that Range's claims against them were based on, were related to, or were in response to the exercise of relators' protected rights under chapter 27. Range, however, could avoid dismissal of its claims by providing "clear and specific evidence" that satisfied a prima facie case for each essential element of the claims. *Id.* § 27.005(c).

**Defamation and business disparagement**

To prevail on a defamation claim, the plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory concerning the plaintiff, (3) while acting with either actual malice, if the plaintiff is a public official or a public figure, or negligence, if the plaintiff is a private individual, regarding

18

the truth of the statement. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999). A statement is defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pets. denied) (op. on reh'g) (citing Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011)). When actual malice is required, it may be established by proof that the defendant knew a statement was false or made the statement with reckless disregard about whether it was false, meaning that the defendant had serious doubts about the statement's truth. *McLemore*, 978 S.W.2d at 573–74; *see also Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637–38 (Tex. 2005) (explaining that actual malice occurs when a party purposefully avoids the truth or bases a statement on obviously dubious information). When only negligence is required for the defendant's fault, the plaintiff must prove that the defendant should have known that the published statement was false. *See McLemore*, 978 S.W.2d at 571; *Klentzman v. Brady*, 312 S.W.3d 886, 898 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

Under either fault standard, the statement must be "of and concerning" the plaintiff. *See Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144 (Tex. App.—Fort Worth 2009, pet. denied); *Cox Tex. Newspapers, L.P. v. Penick*, 219

19

S.W.3d 425, 433 (Tex. App.—Austin 2007, pet. denied). A publication is "of and concerning" the plaintiff if persons who knew and were acquainted with the plaintiff "understood from viewing the publication that the allegedly defamatory matter referred to the plaintiff." *Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 173 (Tex. App.—Eastland 2003, pet. denied). The statement must refer to the plaintiff and "no one else." *Kaufman*, 291 S.W.3d at 147–48 (quoting *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 290, 339 S.W.2d 890, 894 (1960)).

A statement may be defamatory, although literally true, if the omission of material facts allows a reasonable person to perceive a false impression. *Turner*, 38 S.W.3d at 114–15; *Klentzman*, 312 S.W.3d at 898–99. Also, a defendant may be liable for defamation if a reasonable person would recognize that an act creates an unreasonable risk that defamatory matter will be communicated to a third party. *See George v. Deardorff*, 360 S.W.3d 683, 690 (Tex. App.—Fort Worth 2012, no pet.).

In most defamation claims, the plaintiff must prove the existence and amount of damages caused by the defamatory statement. *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 580. Some statements, however, are defamatory per se, meaning that the law presumes the defendant's injury. *See Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984)

(op. on reh'g) (explaining that a false statement charging someone with the commission of a crime is defamatory per se); *Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 580–81; *see also Morrill v. Cisek*, 226 S.W.3d 545, 549 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Defamation is actionable per se if it injures a person in his office, business, profession, or occupation.").

> prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. A business disparagement claim is similar in many respects to a defamation action. The two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests. . . . [A] business disparagement defendant may be held liable "only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion."

The supreme court has explained that to

*Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (citations and emphasis omitted) (quoting *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987)). Proof of special damages is an "essential part of [a plaintiff's] cause of action for business disparagement. . . . [T]he communication must play a substantial part in inducing others not to deal with the plaintiff with the result that special damage, in the form of the loss of trade or other dealings, is established." *Hurlbut*, 749 S.W.2d at 767; *see Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 628 (Tex. App.—Fort Worth 2007, pet. denied) (op. on reh'g).

21

**Evidence concerning the Lipskys**

In the trial court, through responding to relators' motions to dismiss, Range presented evidence that, according to Range, proves that the Lipskys, or their agents, made false, misleading, and disparaging communications. The alleged false and misleading communications include disseminating "misleading videos . . . that show [Steven Lipsky] lighting the end of a garden hose on fire" when the hose was actually connected to the well's gas vent, and stating or implying that

- Range's drilling went under the Lipskys house while omitting that Range's wellbore was over a mile below the surface;

- the Lipskys' well no longer pumped water (when it actually could);

- the Lipskys had found unnatural detergents in the water;

- the Lipskys could not live in their home (although they continued to do so);

- Range would eventually "own" the Lipskys' home (which implied that Range was responsible for contaminating the Lipskys' water source and would be liable for doing so);[16]

- Range was politically powerful and had prevailed with the Railroad Commission through corruption,[17] even though the Railroad Commission had considered extensive evidence to support its decision and the Lipskys had not participated in the Railroad Commission's hearing;

---

[16]This statement was made to an appraisal review board and, according to Steven Lipsky's deposition, could have been repeated to friends and family.

[17]For example, Range presented evidence that Steven Lipsky told a newspaper reporter that Range owned the Railroad Commission and "got away with" contaminating his well.

- the Lipskys could literally light their water on fire, and the water was unsafe to drink;[18]

- Range's drilling operations contaminated the water (even though the Railroad Commission had found that the operations had not);[19] and

- Range treated the Lipskys like "criminals."

Range also contended that the evidence showed that the Lipskys acted with actual malice because, among other reasons, they blamed Range before and after the Railroad Commission had concluded its investigation and had found that Range had *not* contaminated the Lipskys' well; Steven Lipsky failed to disclose, when blaming Range, that the Railroad Commission had ruled in Range's favor; Steven Lipsky stated under oath in January 2011 that he did not know the cause of the contamination but made statements at other times blaming Range (including, prior to January 2011, implying that Range would be liable for contaminating his well); and Steven Lipsky said that he could light his water on fire when he knew that the hose was attached to the well's gas vent.

---

[18]Steven Lipsky told a reporter, "You can't drink this water." In a deposition, however, Rich indicated that the gas level in the Lipskys' water was not high enough to cause an imminent danger. She also conceded that the levels of gases in the Lipskys' water were below national drinking water standards. Range funded testing of the Lipskys' water by an independent company, and that company determined that there were no gases that made the water unsafe to drink.

[19]For example, Steven Lipsky was quoted in a newspaper article as stating that the Railroad Commission's decision that Range had not contaminated the Lipskys' well was "ridiculous."

We conclude that the trial court did not clearly abuse its discretion by determining that Range had presented clear and specific evidence to establish a prima facie case for each essential element of its defamation and business disparagement claims against Steven Lipsky; the trial court could have reasonably concluded that the facts established by Range, which we have summarized above, provide at least a "minimum quantum of evidence necessary to support a rational inference" that Range has met its burden with regard to those elements. *See E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 223; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). Specifically, for example,[20] the trial court could have reasonably concluded that a rational inference of a false, defamatory, and disparaging statement arose from Steven Lipsky's communication that Range prevailed in the Railroad Commission through corruption.[21] The trial court could have also concluded that there was a rational inference that this statement was made with actual malice, as defined above, in

---

[20]We conclude that Range presented sufficient evidence to maintain its claims against Steven Lipsky for defamation and business disparagement at this preliminary stage in the litigation, but we do not intend to indicate an opinion about whether the claims will ultimately have merit. None of the parties to this original proceeding have requested for us, at this stage, to individually assess the merits of each of the numerous statements relied on by Range to support those claims, and we decline to do so. Thus, we express no opinion about whether the privileges asserted by Steven Lipsky bar Range's claim for relief on various statements.

[21]The trial court could have reasonably concluded that whether Range owned the Railroad Commission and had prevailed in the Railroad Commission's proceeding through corruption were verifiable facts that may be subject to a defamation claim. *See Bentley v. Bunton*, 94 S.W.3d 561, 583–85 (Tex. 2002).

24

light of the evidence that the Lipskys did not participate in the Railroad Commission's proceedings and that the Railroad Commission made its decision after listening to several expert witnesses, including witnesses with advanced degrees and significant experience in the gas industry. And concerning the requirement for Range's defamation and business disparagement claims that Steven Lipsky's statements caused damage, David Poole, a senior vice president for Range, stated in an affidavit,

> As a direct and proximate result and consequence of the . . . false, disparaging, and defamatory public statements made by Steven Lipsky . . . regarding Range and its operations, Range's business and reputation have been harmed. . . . The numerous false, disparaging, and defamatory public statements made by Mr. Lipsky . . . have caused Range to be associated in the public as a polluter of water and the environment, and nothing could be further from the truth.
>
> . . . As a direct and proximate result and consequence of the false, disparaging, and defamatory statements made by Mr. Lipsky . . ., *Range has suffered direct pecuniary and economic losses and costs, lost profits*, loss of its reputation, and loss of goodwill in the communities in which it operates. To date, the damages suffered by Range as a direct and proximate result and consequence of the conspiracy and . . . defamatory public statements made by Lipsky and Rich are in excess of three million dollars. [Emphasis added.]

Although Poole's affidavit is concise, we conclude that by stating that Range had suffered direct economic losses and "lost profits," it provided the trial court with minimum but sufficient facts, at this stage in the litigation, to raise a rational inference, and therefore serve as prima facie proof, that Range lost "trade or other dealings" as a result of statements made by Steven Lipsky. *See Hurlbut*, 749 S.W.2d at 767; *see also Hines*, 252 S.W.3d at 501 (explaining that ordinarily,

25

defamation claims require proof of damages).[22]  Poole's affidavit is clear and specific about the facts included within it, even if it is not elaborate.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c).  For all of these reasons, we conclude that the trial court did not abuse its discretion by denying Steven Lipsky's motion to dismiss Range's defamation and business disparagement claims against him.

Range has not directed us to any evidence, however, establishing that Shyla Lipsky published statements, defamatory or otherwise, concerning Range, and we have located none.  In Range's briefing, it argues, concerning Shyla specifically, only that she "wanted to provide information to the media" and that she participated in a conspiracy with her husband and Rich to "defame and disparage" Range.  As explained below, we conclude that Range did not present sufficient evidence of such a conspiracy.  And although Range argued in the trial court's hearing on the dismissal motions that Shyla was liable for statements made by her agents, Range has not cited authority or provided analysis establishing that Shyla should be liable for statements that her agents made.  To hold a defendant liable for defamation based on an agency relationship, a plaintiff must show that the defendant's agent made a statement in the general authority

---

[22]Furthermore, the trial court could have reasonably concluded that Steven Lipsky's statements that Range owned the Railroad Commission and prevailed in the Railroad Commission's proceedings through corruption were defamatory per se because the statements implied that Range had engaged in criminal activity.  *See Wechter*, 683 S.W.2d at 374; *French v. French*, 385 S.W.3d 61, 72 (Tex. App.—Waco 2012, pet. denied); *see also* Tex. Penal Code Ann. § 36.02(a)(1) (West 2011) (stating that bribery occurs when a person intentionally or knowingly offers a benefit as consideration for a public servant's decision).

of the agency and for the accomplishment of the objective of the agency. *See Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 576, 578–79 (Tex. 2002); *Louis v. Mobil Chem. Co.*, 254 S.W.3d 602, 610 (Tex. App.—Beaumont 2008, pet. denied). Range has not provided analysis of these requirements of its defamation and business disparagement claims against Shyla or directed us to where we can locate evidence about the Lipskys' agents that satisfies the requirements. Also, Shyla cannot be personally liable for Steven's acts merely because of their marriage relationship; he was not her agent solely because they were married. *See* Tex. Fam. Code Ann. § 3.201(a)(1), (c) (West 2006). Thus, we conclude that Range did not provide clear and specific evidence of a prima facie case for each essential element of its defamation and business disparagement claims against Shyla, and we conclude the trial court clearly abused its discretion by denying Shyla's motion to dismiss Range's defamation and business disparagement claims against her. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c).

**Evidence concerning Rich**

In the trial court, while responding to Rich's motion to dismiss, Range contended that Rich was liable for defamation and business disparagement particularly because

- "[Steven] Lipsky ha[d] said that scientists who tested his well ha[d] said that his well could only have been contaminated by nearby gas drilling"; and

27

- Rich falsely or misleadingly told EPA officials that she was concerned about a risk to the Lipskys; that one of her sampling technicians had suffered respiratory distress after breathing what she believed to be harmful fumes; and that she had detected methane, ethane, propane, and butane in the Lipskys' water.

Steven Lipsky's March 2011 statement, which appeared in various media publications, about communications from "scientists" who had tested his well and had said that the contamination of an established water well could be caused "only" by natural gas drilling, does not identify Rich as one of the scientists who made that statement. The record establishes that along with Rich, officials from the EPA and the Railroad Commission conducted tests at the Lipskys' home before Lipsky made the statement about the conclusion of scientists who had tested his well. Before March 2011, the EPA officials determined that Range could have caused or contributed to the contamination of the Lipskys' water. During Rich's deposition, which was taken in January 2011 in the course of the Railroad Commission's proceeding, she said that after completing testing at the Lipskys' residence, she told the Lipskys that it was her opinion that a natural gas well had compromised their water well but that she could not ascertain which well had done so. Rich explained in the deposition that she had "no way of knowing" which gas well had affected the Lipskys' water well, and she indicated that she had advised the Lipskys to contact the Railroad Commission to "get some pressure testing done . . . to find out if the wells were actually compromised." At the time of the deposition, Rich opined that the "probable" cause of gas in the

28

Lipskys' water well was natural gas drilling.[23]  Range has not directed us to any part of the record, however, establishing that Rich was the person who made the particular statement expressly relied upon by Range to support its defamation and business disparagement claims that an established water "well could *only* have been contaminated by nearby gas drilling."  [Emphasis added.]  Thus, we conclude that Steven Lipsky's March 2011 statement to the media about the conclusion of "scientists" who conducted tests at his home cannot support Range's defamation or business disparagement claims against Rich.  *See Forbes Inc.*, 124 S.W.3d at 170 (requiring proof, in a business disparagement claim, that the defendant published the statement at issue); *McLemore*, 978 S.W.2d at 571 (requiring the same evidence in a defamation claim).

Rich's other statements to the EPA, summarized above, even if proven false, relate to the environmental conditions at the Lipskys' home but do not name or blame Range for causing those conditions.  Because these statements are not "of and concerning" Range, they likewise cannot serve as clear and specific proof of Range's defamation and business disparagement claims against

---

[23]To the extent that Range relies on statements made by Rich exclusively in her deposition to support its defamation and business disparagement claims, Range recognizes in its briefing that communications made in the course of a quasi-judicial proceeding are subject to an absolute privilege.  *See James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) (expressing that the absolute privilege applies to statements made in depositions); *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 111, 166 S.W.2d 909, 912–13 (1942) (stating that the Railroad Commission is a quasi-judicial body and that communications to quasi-judicial bodies are absolutely privileged).

29

Rich. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)*; Kaufman*, 291 S.W.3d at 144–48; *Penick*, 219 S.W.3d at 433 (explaining that to be "of and concerning" the plaintiff, the defendant's publication must "refer to some ascertained or ascertainable person and that person must be the plaintiff").

In an oral argument handout, Range alleged, concerning Rich, only that in her initial communication with the EPA, she "blamed Range and [fracking] for contamination of the Lipskys' well." We have not located such evidence from the record references that Range provided. Beyond the statement in the handout, Range has not expressed in this court that it is basing its defamation or business disparagement claims against Rich on any other statements made by Rich to the EPA, or to anyone else, that specifically concerned Range rather than only generally concerning the contamination of the Lipskys' well and the environmental effects of the contamination.

Because Rich's statements that Range relies on to support its defamation and business disparagement claims did not "concern" Range, we conclude that there is no clear and specific evidence to prove a prima facie case for an essential element of those claims and that the trial court clearly abused its discretion by denying Rich's motion to dismiss those claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *Kaufman*, 291 S.W.3d at 144–48; *Penick*, 219 S.W.3d at 433.

30

**Civil conspiracy and aiding and abetting**

An actionable civil conspiracy is a combination by "two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 701 (Tex. App.—Fort Worth 2006, pet. denied). The essential elements of a civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.* A defendant's liability for conspiracy depends on "participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Id.*; *see also Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979) ("It is not the agreement itself, but an injury to the plaintiff resulting from an act done pursuant to the common purpose that gives rise to the cause of action."). Recovery for civil conspiracy is not based on the conspiracy but on the underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding) (op. on reh'g). Once a civil conspiracy is proven, each coconspirator "is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination." *Carroll*, 592 S.W.2d at 926. A civil conspiracy claim may be proved by circumstantial evidence and reasonable inferences from parties' actions. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963).

31

In the trial court, Range initially pled that the object of a conspiracy between the Lipskys and Rich was "to make false and damaging accusations that Range's operations had contaminated [the] Lipskys' water well." Range also alleged that Rich had participated in the scheme so that she could "circulate false accusations against Range to further her business and her anti-natural gas agenda." When Range responded to relators' motions to dismiss, it contended that the "object of the conspiracy was to make false and defamatory statements that Range's operations caused the alleged contamination"; that Rich and the Lipskys decided to blame Range for the contamination before receiving any evidence that Range was at fault; that Rich and the Lipskys agreed on a strategy of creating a "false sense of 'damage'" associated with the Lipskys' air quality to obtain the EPA's involvement; and that Rich made misleading statements to the EPA, including providing copies of "misleading videos."

In this court, Range asserts that it presented evidence in the trial court "showing that the Lipskys and Rich agreed and conspired to defame and disparage Range by making false and misleading statements that Range caused the alleged contamination of the Lipskys' water well," including that they provided misleading information to the EPA and manufactured, through an air test five feet away from the gas vent on the water well, a non-existent imminent danger to get the EPA to prosecute Range as a wrongdoer. Range argues that the central part

32

of the conspiracy "was Rich's 'strategy' to stage a deceptive air test designed to create a non-existent imminent danger."

A letter sent by Rich to Steven Lipsky on August 9, 2010 recites that the purpose of Rich's testing was to "characterize the water and ambient air conditions present" on the property. While the letter referenced "recent gas well development" near the Lipskys' property, the letter did not accuse Range of contaminating the Lipskys' well or express that the goal of Rich's testing would be to prove that Range did so. Similarly, although Rich's bid proposal that accompanied her August 9 letter described the tests planned by Rich, explained that the tests could determine the presence of various compounds, and stated generally that natural gas development may cause water and soil contamination, the proposal did not blame Range for contaminating the Lipskys' well.

On August 12, 2010, Rich sent an e-mail to Steven Lipsky stating in part,

> Steve,
>
> I left a message for you earlier today regarding an air test at the [well head]. Yes, I know it is expensive – but after serious consideration I am strongly recommending we take an air sample 5 feet away from the hose that is hooked up to the well head. . . .[24]

_____

[24]Range contends that Rich's plan to take an air sample five feet away from the well head was calculated to create a "non-existent imminent danger." As Rich contends, however, the Railroad Commission and the EPA each confirmed the presence of gas in the Lipskys' water well. According to the EPA, the Railroad Commission's test of the Lipskys' water showed higher levels of benzene and toluene than Rich's test had. The EPA's test showed higher levels of benzene, toluene, and dissolved methane than Rich's test had, and the EPA concluded that these gases posed a "variety of risks to health of persons."

33

TCEQ does not have any jurisdiction over water, only the [Railroad Commission] – and you saw how helpful they were. Just wait, it gets better. However, TCEQ has total jurisdiction over air emissions. Once the natural gas leaves the water it is an airborne issue; and therefore falls into their laps to get involved – which they will jump because they are in the middle of SunSet Review (oversight by EPA).

Also, I can then contact the EPA and discuss the fact that we have a multi-issue environmental concern, including potential for explosion AND impact to human health (especially children)[, and] they will be very receptive.

It is worth every penny if we can get jurisdiction to EPA who oversees TCEQ. I would like to get my [technician] out there tomorrow if you approve of this strategy. Please advise.

Range contends that this e-mail proves that the object to be accomplished in the conspiracy was defamation, but the language of the e-mail focuses on the contamination of the Lipksys' well and on executing a plan to trigger an investigation into the contamination rather than on blaming Range or pursuing an action against Range for the contamination. Two days after Rich sent the e-mail, she conducted tests at the Lipskys' residence. Eight days after Rich sent the e-mail, after she had collected preliminary data, she contacted the EPA. An e-mail sent by an EPA official following Rich's call to him referenced Rich's concern about the environmental conditions on the Lipskys' property, but the e-mail did not express that Rich had blamed Range for those conditions or had asked the EPA to take action against Range. Rich swore in an affidavit that when she called the EPA official, she "did not mention any Range entity by name or offer any opinion as to where the contaminants were coming from."

34

Range contends that Rich is "predisposed to blame oil and gas drilling anytime there is alleged contamination." Despite this alleged predisposition, however, Range did not present clear and specific evidence establishing that Rich had conspired with the Lipskys to blame Range on this occasion. Also, Range asserts that in furtherance of the conspiracy to defame and disparage Range, "videos of Mr. Lipsky lighting the end of the green garden hose were distributed to the media and others for the false and misleading proposition that the Lipskys' water is flammable." While the EPA official's August 20, 2010 e-mail states that Rich had told the official about the video, the e-mail also reflects that Rich had correctly disclosed to the official that the hose "was attached to [the Lipskys'] well vent." Range has not directed us to any evidence showing that Rich participated in distributing the video to the media, which reported that the video showed water being lit on fire, and the television reports about the video do not mention Rich.[25]

For these reasons, we conclude that Range did not establish through clear and specific evidence a prima facie case that relators agreed on the objective to defame Range, which is an essential element of Range's civil conspiracy claim as Range pled it. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983);

[25]Rich stated in an affidavit, "Although contacted by several media sources[,] I did not give out any information about my tests to anyone but the Lipskys and the [EPA]." Rich also swore, "At no time did I refer to any Range entity or activity to any individual or organization and did not give any opinion as to the source of the gas. I simply reported that the well contained components related to natural gas."

35

*Cotten*, 187 S.W.3d at 701. Specifically, we have located no evidence showing that Rich agreed with the Lipskys to publicly blame Range for the contamination or that she ever in fact did so. Thus, we hold that the trial court clearly abused its discretion by denying relators' motions to dismiss Range's civil conspiracy claim under chapter 27. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)–(c).

In its pleading, on the same facts as it based its civil conspiracy claim, Range also brought a claim against relators for "aiding and abetting."[26] Relators sought dismissal of this claim. In responding to relators' motions to dismiss in the trial court, Range did not particularly discuss the elements or facts of its aiding and abetting claim or argue that the claim could survive independently from the civil conspiracy claim. Similarly, in this court, Range has not briefed its aiding and abetting claim separately from its civil conspiracy claim. Thus, for the same reasons that we have concluded that the trial court abused its discretion by denying relators' motions to dismiss Range's civil conspiracy claim, we likewise hold that the trial court abused its discretion by denying relators' motions to dismiss Range's aiding and abetting claim.

---

[26]There is some uncertainty about whether Texas recognizes a cause of action of "aiding and abetting" separately from a civil conspiracy claim. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 n.7 (Tex. 2001); *O'Kane v. Coleman*, No. 14-06-00657-CV, 2008 WL 2579832, at *5 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.).

**The Adequacy of Relators' Remedy by Appeal**

Although we have determined that the trial court clearly abused its discretion, in part, by denying relators' motions to dismiss Range's claims under chapter 27, we cannot grant relief unless we determine that relators' remedy by appeal is inadequate. *Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d at 207; *Aslam*, 348 S.W.3d at 301. Because we have interpreted chapter 27 as not providing an interlocutory appeal when the dismissal of a plaintiff's claims is expressly and timely denied by a trial court, an immediate appellate remedy is not available to relators. *Lipsky*, 2012 WL 3600014, at *1 (citing *Jennings*, 378 S.W.3d at 529).

In this court, citing section 27.008(b) of the civil practice and remedies code, Range has recognized that when a trial court timely rules on a motion to dismiss, as the trial court did here, the trial court's decision may be reviewed by a petition for a writ of mandamus. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.008(b) (stating that an "appellate court shall expedite an appeal *or other writ* . . . from a trial court order on a motion to dismiss a legal action" under chapter 27) (emphasis added). Nonetheless, Range contends that relators have not presented sufficiently extraordinary circumstances to justify relief.

An "adequate" remedy by appeal has "no comprehensive definition" and should not be decided based on "simple rules that treat cases as categories"; rather, in determining whether a relator has an adequate remedy by appeal, we

37

must carefully analyze the costs and benefits of granting mandamus relief. *In re W.L.W.*, 370 S.W.3d 799, 807 (Tex. App.—Fort Worth 2012, orig. proceeding [mand. denied]). An appellate remedy is adequate "when any benefits to mandamus review are outweighed by the detriments." *Id.* (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding)). In our consideration of whether an appellate remedy is adequate, we should consider whether mandamus review will spare litigants and the public the time and money wasted "enduring eventual reversal of improperly conducted proceedings." *Id.* (quoting *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding)). The "most frequent use . . . of mandamus relief involves cases in which the very act of proceeding to trial . . . would defeat the substantive right involved." *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008) (orig. proceeding); *see also In re Kings Ridge Homeowners Ass'n, Inc.*, 303 S.W.3d 773, 785 (Tex. App.—Fort Worth 2009, orig. proceeding) (expressing that we will not typically intervene to control incidental trial court rulings).

The legislature has determined that unmeritorious lawsuits subject to chapter 27 should be dismissed early in litigation, generally before parties must engage in discovery. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(b)–(c), .005(a)–(b); *Jennings*, 378 S.W.3d at 526. The supporters of the bill leading to the enactment of chapter 27 noted that the bill's purposes were to allow a prevailing movant of a motion to dismiss to achieve dismissal "earlier than would

38

otherwise be possible" and to avoid costly legal expenses, including discovery expenses, even before the summary judgment stage of litigation. House Research Org., Bill Analysis, Tex. H.B. 2973, 82nd Leg, R.S. (2011); Senate Research Ctr., Bill Analysis, Tex. H.B. 2973, 82nd Leg., R.S. (2011).[27] Requiring a proper movant for dismissal under chapter 27 to engage fully in litigation, including a possible trial, would eviscerate these purposes and would ignore the legislature's determination that customary procedures are inadequate in some respects to protect defendants in cases falling within chapter 27's guidelines. Likewise, requiring proper chapter 27 movants generally to proceed through litigation when they should be entitled to dismissal harms a broader purpose of chapter 27 to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." Tex. Civ. Prac. & Rem. Code Ann. § 27.002; *see also* House Research Org., Bill Analysis, Tex. H.B. 2973, 82nd Leg, R.S. (2011) (stating that the types of lawsuits that are subject to dismissal under chapter 27 "chill public debate" and are "particularly problematic for independent voices that are not part of a news or media company").

The statute underlying this mandamus action is similar to the health care statute that the supreme court considered in *McAllen Med. Ctr., Inc.*, 275 S.W.3d

---

[27]In the trial court, Range conceded that "Chapter 27 requires a motion to dismiss to be determined early on the litigation process in order to reduce litigation costs." Range also candidly stated that chapter 27 provides a "mandate that the motion [to dismiss] be filed and heard as soon as practicable."

at 464–69.  In that case, while considering whether mandamus relief should be granted from a trial court's abuse of discretion in denying a hospital's motion to dismiss a health care liability claim because of the plaintiffs' failure to comply with a statute requiring sufficient expert reports, the court stated,

> Here, the Legislature has already balanced most of the relevant costs and benefits for us.  After extensive study, research, and hearings, the Legislature found that the cost of conducting plenary trials of claims as to which no supporting expert could be found was affecting the availability and affordability of health care— driving physicians from Texas and patients from medical care they need.  Given our role among the coordinate branches of Texas government, we are in no position to contradict this statutory finding. . . .  [D]enying mandamus review would defeat everything the Legislature was trying to accomplish.

*Id.* at 466 (footnote omitted).  Similarly, we conclude that denying mandamus relief in this case would defeat what the legislature was trying to accomplish, which was the early dismissal of unmeritorious claims that come within chapter 27's purview.

Finally, along with a movant's entitlement to early dismissal that will be lost if we refuse to grant mandamus relief in appropriate chapter 27 cases, the movant may also lose, by proceeding to trial, a statutory entitlement to attorney's fees and costs when dismissal is warranted under the chapter.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(1).

For all of these reasons, we hold that relators have no adequate remedy by appeal to the extent, as explained above, that the trial court clearly abused its discretion by denying their motions to dismiss Range's claims under chapter 27.

40

*See Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d at 207; *Aslam*, 348 S.W.3d at 301.

**Conclusion**

Having held that the trial court clearly abused its discretion by denying Rich's and Shyla Lipsky's motions to dismiss all of Range's claims against them and that Rich and Shyla Lipsky have no adequate remedy by appeal, we conditionally grant their petitions for a writ of mandamus, order the trial court to set aside its February 16, 2012 order denying their motions to dismiss, and order the trial court to enter an order dismissing Range's claims against them. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)–(c). Having concluded that the trial court clearly abused its discretion by denying Steven Lipsky's motion to dismiss Range's civil conspiracy and aiding and abetting claims against him and that he has no adequate remedy by appeal, we conditionally grant, in part, his petition for a writ of mandamus, order the trial court to set aside its February 16, 2012 order denying his motion to dismiss to the extent that the motion concerned Range's civil conspiracy and aiding and abetting claims, and order the trial court to enter an order dismissing those claims against him. *See id.* We deny the remainder of the relief sought by Steven Lipsky, thereby leaving pending Range's claims for defamation and business disparagement against

him.  A writ of mandamus will issue only in the event the trial court fails to comply with our instructions within thirty days of the date of this opinion.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  April 22, 2013